TAZENNA KENNEDY,

       Plaintiff,

vs.                          CASE NO.  3:11-cv-660-J-37TEM

UNITED OF OMAHA LIFE
INSURANCE COMPANY,
a foreign corporation,

       Defendant.

_____

## REPORT AND RECOMMENDATION[1]

This case is before the Court on the parties' cross motions for summary judgment (Docs. #18 & 19), and the parties' respective responses thereto (Docs. #21 & 20).  The cross motions for summary judgment were referred to the undersigned for a report and recommendation on September 29, 2011 (Doc. #14).  For the reasons stated herein, it is respectfully recommended that Defendant's Motion for Summary Judgment (Doc. #18) be **GRANTED**, and Plaintiff's Motion for Summary Judgment (Doc. #19) be **DENIED**.

## I. BACKGROUND

This is an action for long-term disability ("LTD") benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461.  Plaintiff Tazenna Kennedy ("Kennedy") was employed as a therapist for River Point Behavioral Health, a

---

[1] Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation.  Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); and, Local Rule 6.02(a), United States District Court for the Middle District of Florida.

subsidiary of Psychiatric Solutions, Inc. As an employee of Psychiatric Solutions, Inc., Kennedy had long-term disability coverage under Group Policy No. GUPR-AA8W (the "Policy") issued and administered by Defendant United of Omaha Life Insurance Company ("United"). Under the terms of the Policy:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
> > (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> >
> > (b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.
>
> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

(AR 20).[2] "Regular Occupation" is defined as:

> the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

(AR 54). The Policy provides that benefits for disability will end at any of the following

---

[2] The parties filed the administrative record under seal. However, to rule on the cross motions, the Court must discuss portions of the administrative record. Citations to the Administrative Record are designated "AR" followed by the stamped page number.

points: "(e) the day You fail to provide Us satisfactory proof of continuous Disability and/or any Current earnings; (f) the day you are not under Regular Care for the Injury or Sickness that caused the Disability." (AR 37).  The Policy defines "Regular Care" as: "You visit a Physician as frequently as is medically required, according to standard medical practice, to effectively manage and treat Your disabling condition; and You receive Appropriate Care and Treatment." (AR 54).  "Appropriate Care and Treatment" and "Medically Necessary" are further defined in the Policy and impose requirements on a claimant seeking benefits to, inter alia, obtain medical care the purpose of which is "to improve Your medical condition and thereby aid in Your ability to return to work."  (AR 52, 54).

As a therapist in the Behavioral Services department at Riverpoint Behavioral Health, Kennedy's major job functions included:

> obtaining assessments, conducting individual/group therapy on assigned cases; complete documentation per policy and procedure' case coordination; coordinate discharge planning; assist in developing and maintaining community resource information; performs marketing functions as assigned; assists in the maintenance of the program environment in compliance with policies of safety and security; ensures good clinical judgment to ensure optimum patient care; participate in continuing education activities.

(AR 405).  The description provided by Riverpoint indicated the job involves occasional exposure to "moving mechanical parts, fumes or airborne particles and outdoor weather conditions."  (AR 406).  Additionally, Kennedy's job required frequent computer use; frequent use of reasoning, math and language skills; frequent ability to make independent judgments; continuous ability to relate to others; continuous use of written and verbal communication skills; occasional walking, balancing, stooping, kneeling, crouching, crawling, reaching/working overhead, climbing, pushing and pulling; frequent standing and

lifting/carrying; and continuous sitting. (AR 1214-15). Kennedy may alternate between sitting and standing. (AR 1215). United determined, and Kennedy has not disputed, that her position as a therapist is a sedentary position that coincides with the definition of Psychiatric Social Worker, Dictionary of Occupational Titles ("DOT") 195.107-034. (AR 1301).

Kennedy filed a long-term disability claim on June 9, 2010, which was received by United on July 22, 2010. (AR 1217-22). Kennedy alleged she was unable to work as of January 5, 2010 due to asthma. *Id.* It is undisputed that Kennedy suffers from asthma.

Pending its investigation of her claim, United determined that based on the claimed disability date of January 5, 2010, the Policy's ninety day elimination period for Kennedy's claim would be satisfied as of May 24, 2010. While it investigated the claim, United agreed to pay Kennedy benefits for her claimed disability under a reservation of rights for work days missed from May 24, 2010 through July 24, 2010. (AR 900, 902).

Per Kennedy's employee statement on the Long-Term Disability Claim Form, she became unable to work on January 5, 2010 due to "asthma being triggered possibly by environment at work." (AR 1218). That day, Kennedy visited Dr. Vincent Ober's office and met with physician's assistant Jennifer Matthews ("Matthews") (AR 994). Kennedy complained of shortness of breath with chest tightness. *Id.* She reported she had no previous hospitalizations for asthma, and "only had symptoms of asthma with strong scents or with walking or exercise or cold symptoms but not daily symptoms." *Id.* Kennedy reported she "was not told to take spiriva or advair daily." *Id.* Kennedy was diagnosed with acute exacerbation of asthma secondary to an upper respiratory infection,

and instructed to go to the emergency room for evaluation and treatment. (AR 995).

Kennedy was confined as an inpatient at Baptist Medical Center from January 5, 2010 to January 12, 2010 for asthma exacerbation and acute bronchitis. (AR 716). Kennedy reported she experienced asthma exacerbation usually once a month and mostly when the weather changed. *Id.* She was treated with intravenous steroids, bronchodilators, and cough medication. *Id.* Her chest x-rays were clear. *Id.* Kennedy's symptoms "improved markedly" during her hospital stay. *Id.* She was discharged with instructions to take the following medications: Advair, Levaquin, and albuterol. (AR 717). Kennedy returned to Dr. Ober's office for follow up on January 13, 2010. (AR 989). Matthews reported Kennedy had not yet picked up her medication from the hospital. *Id.* Kennedy was instructed to start the medications as given by the hospital and follow up in a week. (AR 992).

On January 19, 2010, Kennedy returned to Dr. Ober's office. (AR 986). She reported she had been taking her asthma medication at home but her symptoms seemed to be worsening. *Id.* Because Kennedy had not improved on outpatient treatment, she was referred back to the emergency room for treatment and evaluation. (AR 987-88). At the emergency room, Kennedy was diagnosed with acute bronchitis and cough. (AR 832). A chest x-ray showed lungs not as well expanded and a mild degree of resulting vascular crowding. *Id.*

Kennedy returned to Dr. Ober's office on January 21, 2010 for follow up. (AR 983). She reported she was felling better but still had intermittent wheezing that was relieved with albuterol. *Id.* She was told to continue with her medications as given in the

emergency room. (AR 984). Kennedy followed up with Dr. Ober's office on January 28, 2010. (AR 615). Kennedy reported her cough had not improved. *Id.* Matthews noted Kennedy was using her nebulizer twice per day which was helping, but had not started the Prevacid as directed at the previous visit. *Id.* Kennedy's respiratory examination was normal. (AR 616). Kennedy was given antibiotics for her cough, which was "not likely secondary to asthma." (AR 617).

Kennedy returned to Dr. Ober's office on February 16, 2010 and reported she was feeling better. (AR 609). On February 22, 2010, Kennedy reported her cough had improved, and she was not experiencing wheezing of shortness of breath. (AR 606). Matthews noted Kennedy's asthma, bronchitis and cough were resolved. (AR 607). Kennedy was released to work half-days for a week before being reevaluated. *Id.*

Kennedy returned to work on February 23, 2010, and worked until March 1, 2010. (AR 851-52). Kennedy next visited Matthews at Dr. Ober's office on March 2, 2010 complaining of dizziness with congestion, vomiting, burning in her chest, and a productive cough. (AR 603). She reported she felt better at home but worse while working. *Id.* She was experiencing shortness of breath after coughing and with exposure to certain smells and perfumes. *Id.* Her oxygen saturation was normal, but she was positive for respiratory wheezing and cough. (AR 604). Kennedy was prescribed Omnicef and advised to continue her nebulizer treatments. *Id.*

On March 5, 2010, Kennedy saw Dr. Ober for a follow up of her asthma exacerbation. (AR 600). Dr. Ober noted she had been prescribed steroids but was unable to obtain her medications. *Id.* Kennedy reported tightness, cough, wheezing, and

shortness of breath for two days. *Id.* Dr. Ober prescribed several medications, including cefdinir, Advair Diskus, Singulair, albuterol, and ProAir. (AR 601-02).

Kennedy followed up with Matthews two weeks later on March 19, 2010 and complained of reflux. (AR 597). Kennedy reported she was not able to get the Advair because it was too expensive. *Id.* She reported she was feeling better, and her cough and wheezing had improved. *Id.*

Kennedy returned to work on March 22, 2010. (AR 853). On March 24, 2010, Kennedy underwent allergy testing, with some positive findings for shrimp, cockroach, and mold. (AR 953). Her labs noted she has low levels of potassium, protein, albumin, and red blood count. (AR 955). Kennedy next visited Matthews at Dr. Ober's office on March 26, 2010. (AR 592). She was still not taking the Advair prescribed but was taking the Singulair, nasal steroid, ProAir inhaler and nebulizer. *Id.* She was experiencing cough and cold symptoms. *Id.* Matthews noted Kennedy had "poor control of asthma but patient is noncompliant with prescribed plan." (AR 594).

Kennedy followed up with Matthews four days later on March 30, 2010. (AR 589). She still had not started some of her medications because of the cost. *Id.* She reported her asthma was okay while at home, but she experienced coughing fits and spasms at work. *Id.* She reported she used ProAir without complete relief. *Id.* Kennedy stated her office building may have mold and people smoked outside, which bothered her asthma. *Id.* Matthews noted Kennedy was an asthma patient who had been experiencing exacerbation since she had bronchitis in January 2010. (AR 591). Matthews noted Kennedy had "multiple allergies which are likely exacerbating the asthma." *Id.* Kennedy's

oxygen saturation was normal. *Id.* She was diagnosed with hypokalemia, cough, wheezing which is resolving, heartburn, nausea with vomiting, allergic rhinitis, asthma with acute exacerbation, hemorrhoids, and anemia which is improving. *Id.*

On April 2, 2010, Kennedy was seen in the emergency room after vomiting blood. (AR 821). X-rays of the abdomen revealed normal bowel gas pattern with intact bony structures. (AR 830). There was no evidence of complete bowel obstruction or free air. *Id.* The chest x-ray revealed shallow lung volumes with no infiltrates. *Id.* Kennedy followed up with Matthews later that day. (AR 586). She had started all of her prescribed medications and her asthma had improved. *Id.* However, Kennedy reported she experienced "worsening asthma symptoms at work from some exposure." *Id.* On April 14, 2010, Kennedy met with Dr. Ober and reported she continued to experience wheezing, especially at work. (AR 583). On April 19, 2010, Kennedy returned to the emergency room for shortness of breath and coughing. (AR 812). The chest x-ray showed that her heart was normal size with no mediastinal mass noted. (AR 818). The lungs appeared normal without infiltrate or mass and no effusion. *Id.*

On April 30, 2010, Kennedy returned to Dr. Ober's office and met with physician's assistant Amber Napier ("Napier"). (AR 580). Kennedy reported she was coughing during the day, typically only at work. *Id.* Kennedy stated her asthma improves when she is outside but worsens when she walks into the building. *Id.* She reported that perfume, chemicals, and other irritants cause her to cough and have shortness of breath. *Id.* Napier assessed "moderate persistent asthma which is inadequately controlled." (AR 582).

On May 4, 2010, Kennedy indicated she had seen a pulmonologist, Dr. Pulido, who prescribed prednisone. (AR 577). Kennedy reported that she was still coughing during the day but only at work. *Id.* Kennedy stated that she feels better when outside or at home, but the coughing resumes when she enters her work building. *Id.* Kennedy reported that she uses ProAir at work which helps the first part of the day but her symptoms return once it wears off. *Id.*

On May 11, 2010, Kennedy presented to the emergency room with "worsening dyspnea on exertion, shortness of breath with wheezing, and nonproductive cough." (AR 794). She reported she had used "copious amount of inhaled bronchodilators without any positive effect." *Id.* She stated "approximately 5 days ago, she had several hours of going in and out of the air conditioning back in to the 95-degree heat and this is what she thinks exacerbated this asthma." *Id.* Kennedy reported she was compliant with her medication. (AR 791). Kennedy was admitted and started on DuoNeb, Solu-Medrol, and Levaquin. (AR 789). Her condition improved with treatment and her lung sounds were clear at discharged. *Id.* She was discharged on May 13, 2010 with medications including Levaquin, prednisone and Protonix. (AR 790).

On May 14, 2010, Kennedy followed up with Matthews at Dr. Ober's office. (AR 574). Kennedy reported she was still using Advair, Singulair, and albuterol nebulizer and Ventolin. *Id.* Kennedy reported she was using the albuterol nebulizer treatment prior to work, and had gone to work that day, but was still experiencing shortness of breath, wheezing and cough. *Id.* Kennedy was told to continue Levaquin, prednisone, Advair, Singulair, ProAir, and albuterol nebulizer. (AR 576).

On May 16, 2010, Kennedy presented to the emergency room with right upper quadrant abdominal pain and shortness of breath. (AR 772). A chest x-ray done was normal. (AR 773). Her lungs were clear to auscultation. *Id.* Her white blood cell count was elevated, and her potassium and calcium levels were low. (AR 779). Kennedy was discharged the next day. (AR 772). Kennedy followed up with Matthews at Dr. Ober's office on May 19, 2010. (AR 571). She reported she was given breathing treatments while in the hospital, and left against medical advice because she couldn't sleep. *Id.* She reported she was still on the prednisone, Advair, and Singulair. *Id.* She reported she had been at home and had not experienced shortness of breath, wheezing or cough, and had not needed the nebulizer treatments or ProAir inhaler. *Id.* Her respiratory examination was normal, with no wheezing or shortness of breath. (AR 572). Kennedy was told to continue with her medications. *Id.* On June 2, 2010, Kennedy saw Napier in Dr. Ober's office, who noted she seemed to be doing well at home but continued to have chest tightness and shortness of breath at work. (AR 568). Kennedy indicated she planned to see another pulmonologist for a second opinion. *Id.*

On June 7, 2010, Kennedy presented to Matthews with shortness of breath, chest pain, headache and cough. (AR 563). She reported she had an asthma attack at work that day. *Id.* She reported she feels well at home but she experiences chest tightness, shortness of breath, wheezing, and cough symptoms while at work, due to exposure to cigarette smoke, perfume and cleaning solutions. *Id.* Matthews noted, "The pulmonologist states that it is not work related and suggested that she see an attorney." *Id.* Matthews noted Kennedy had not taken the prednisone given to her by the hospital. *Id.* Kennedy

was told to continue with her current medications.  (AR 565).

On June 8, 2010, Kennedy's worker's compensation claim was denied.  (AR 1229).

On June 15, 2010, Kennedy presented to the emergency room with shortness of breath and wheezing.  (AR 333).  She reported cleaning solutions used at work had caused an asthma attack.  (AR 333, 560).  Kennedy stated she used the ProAir but continued to have symptoms because she remained exposed to the smell.  *Id.*  A chest x-ray done showed no acute disease with clear lungs, normal heart size and no pneumothorax or pleural effusion.  (AR 334).  She was told to see a pulmonologist the next day.  *Id.*  The impression was acute asthma exacerbation.  *Id.*  Kennedy followed up with Matthews later that day and reported she was given nebulizer treatments and a steroid injection at the hospital.  (AR 560).  She reported this resolved the symptoms and she felt better.  *Id.*  Matthews noted Kennedy was to continue her medications.  (AR 562).  Matthews noted she would get Kennedy a portable nebulizer to take to work, and planned to call a lab to see about having an "allergy, Immunocap panel for perfumes and cleaning solutions."  *Id.*

On June 17, 2010, Kennedy saw Dr. Bruce Yergin, a pulmonologist, for a second opinion on her asthma.  (AR 351).  Kennedy reported she experienced occasional shortness of breath, and chest tightness mostly at work or due to cigarette smoke exposure.  (AR 352).  Kennedy reported she had a mild shrimp allergy, and a moderate allergy to mold and roach dander.  (AR 353).  She reported chlorine bleaches caused chest tightness.  (AR 354).  A chest x-ray was negative and revealed normal soft tissues with intact bony structures.  (AR 415).  The cardiac silhouette was within normal limits.  *Id.*

There was no acute pulmonary parenchymal disease or free pleural fluid. *Id.* The pulmonary function test showed severe obstructive ventilatory defect as seen in severe bronchial asthma. (AR 417). Dr. Yergin noted there was a "concurrent extrinsic restrictive ventilatory defect secondary to exogenous obesity." *Id.* Kennedy demonstrated severe coughing spasms with wheezing during the test. *Id.* Kennedy's flow rates were severely decreased and lung volumes were severely reduced. *Id.* Her airway resistance was elevated and her diffusion capacity was normal. *Id.* Her oxygen saturation was ninety-eight percent and her alveolar ventilation was normal. *Id.* Dr. Yergin's impressions were: bronchial asthma, cough variant asthma, second hand smoke exposure, allergic rhinitis, gastroesophageal reflux disease ("GERD"), and hematemesis. (AR 358). Dr. Yergin indicated Kennedy should continue taking Advair, Singulair, ProAir, and prednisone. (AR 358).

On June 18, 2010, Kennedy presented to the emergency room complaining of shortness of breath and chest pain. (AR 284). During a treadmill stress test, Kennedy exercised for three minutes then stopped due to severe shortness of breath and notable wheezing. (AR 310). An exercise induced cough was noted, and most of her symptoms resolved with rest. *Id.* The doctor administering the test concluded Kennedy had "reduced exercise capacity, presumably due to severe asthma." (AR 310-11). Kennedy was treated with intravenous steroids and nebulizer treatments. (AR 286-87). A cardiac work-up and chest x-ray were both negative. (AR 284, 286). Kennedy's asthma exacerbation improved and she was cleared for discharge on weaning steroids on June 21, 2010 by Dr. Yergin, who told her to follow up with him on July 1. (AR 284). Kennedy followed up with

Matthews on June 22, 2010 and reported her symptoms had started on the way to work but her asthma improved with treatment from the hospital. (AR 557).

On June 25, 2010, Matthews was seen by Dr. Ober. (AR 554). He noted Kennedy's asthma was well controlled. (AR 555). The records indicate a letter for job restrictions was completed. (AR 556). Dr. Ober noted diagnoses of chest tightness, asthma well controlled, chronic reflux esophagitis, GERD, obesity, and iron deficiency. (AR 555). That same day, Dr. Yergin wrote a note to Kennedy's employer stating, "This patient is under our care for bronchial asthma and recurrent bronchospastic exacerbation since June 17, 2010. Patient's workup is in progress. She will be seen in our office on July 1 for continuing treatment." (AR 378-79).

On June 29, 2010, Kennedy visited Matthews and reported her asthma was still poorly controlled. (AR 551). Kennedy stated she was waking at night with shortness of breath and wheezing, and using her nebulizer with relief. *Id.* She complained of lightheadedness and dizziness that began after leaving the hospital. *Id.* She indicated she could not work because of these complaints. Id. Kennedy's examination revealed her lungs were clear with good respiratory effort and no wheezes, rales or rhonchi. (AR 553).

On July 1, 2010, Kennedy visited Dr. Yergin again. (AR 349). The review of systems was negative for purulent phlegm, fever or chills. *Id.* Kennedy reported intermittent chest tightness, occasional wheezing, intermittent lightheadedness, and increased fatigue. *Id.* She indicated she was not currently using her nebulizer. *Id.* A six minute walk test showed decreased stamina at forty-six percent of predicted distance in meters. *Id.* Testing was stopped at 252 meters due to coughing and shortness of breath.

*Id.* Oxygen saturation was ninety-nine percent at the start and ninety-one percent at the end. *Id.* Examination showed coarse rhonchi to lung sounds. *Id.* Dr. Yergin assessed bronchial asthma with recent exacerbation, cough variant asthma, secondhand smoke exposure, allergic rhinitis, GERD with hiatal hernia, recent lightheadedness and anemia. *Id.*

Kennedy visited Matthews on July 6, 2010 complaining of dizziness, lightheadedness, and asthma. (AR 544). She noted asthma symptoms she had felt the other day had resolved. *Id.* She noted she was in and out of air conditioning but symptoms resolved when she returned home. *Id.* Physical examination revealed normal respiratory effort with symmetric chest wall movement and no wheezes, rales or rhonchi. (AR 547). She was told to continue with her current medications and to follow up with Dr. Yergin. (AR 548).

On June 23, 201, River Point Behavioral Health sent Kennedy a letter requesting she propose accommodations to allow her to return to work. (AR 404). On July 8, 2010, Kennedy responded and requested the following accommodations: (1) to obtain a housekeeping and floor maintenance schedule so as to avoid exposure to cleaning products; (2) to facilitate group sessions prior to the patient's smoke break; (3) to disallow smoking in front of the main entrance; (4) to remove the cigarette receptacle from the back door so as to discourage smoking in the area; (5) to be permitted to respectfully request persons wearing colognes or perfumes to leave her presence; (6) for an air purifier to be placed in the office; (7) to not be penalized for leaving work to attend doctor's appointments, for hospitalization, or if she is feeling ill; (8) to be allowed an additional thirty

to forty-five minutes at lunch due to GERD; (9) to have flex hours due to fatigue, dizziness, and lightheadedness caused by anemia.  (AR 402-03).

On July 21, 2010, Kennedy completed a Disability Management Questionnaire.  (AR 870).  Kennedy stated she spends her day sleeping because her iron levels are so low. *Id.*  She stated her daughter does most of the cleaning.  Kennedy stated she may do some laundry, but she cannot do much around the house because her iron levels are low and she tries to avoid chemicals.  *Id.*  She stated she drives, and goes out once a day for lunch, to ride with friends in the car, or to the grocery store.  *Id.*  Kennedy stated she can walk about ten to fifteen minutes at a regular pace and can only stand about an hour due to her low iron levels, but it depends on how much trouble she has with her breathing and if her acid reflux is acting up.  (AR 871).  Kennedy stated her endurance is limited and she cannot walk without difficulty breathing, and she becomes lightheaded because her iron is low.  (AR 872).  She listed her current medications as unafil, ProAir, Advair, Singulair, iron pills, albuterol with nebulizer, and dexiprant for acid reflux.  *Id.*  Kennedy stated she cannot perform her job duties due to the environment, which contains chemicals and cigarette smoke.  (AR 873).  Kennedy stated her employer would not accommodate any restrictions and she would not be able to return to work if her job was modified.  *Id.*

Kennedy returned to Dr. Ober's office on July 27, 2010 requesting disability paperwork be completed.  (AR 536).  She requested Dr. Ober submit a letter to her work regarding accommodations for her asthma.  (AR 538).  Dr. Ober indicated he requested pulmonology to do so.  *Id.*  Kennedy was referred to hematology for anemia.  *Id.*

On July 29, 2010 Dr. Yergin wrote a note to Kennedy's employer stating, "This

patient is undergoing a workup for exacerbation of bronchial asthma. We are attempting to adjust her medications. If possible, it would be helpful to limit her exposure to allergens in her environment." (AR 368-69). Thereafter, the record indicates Kennedy failed to attend an appointment with Dr. Yergin on August 2, 2010. (AR 348).

On July 29, 2010, physician's assistant Matthews, in conjunction with Dr. Ober, submitted an Attending Physician's Statement ("APS") to United. (AR 1069-70). Matthews indicated Kennedy's primary diagnosis of asthma, which causes wheezing, dyspnea, chest pain, dizziness, fatigue, and abdominal pain. (AR 1069). Matthews stated diagnostic testing included a pulmonary function test, chest x-ray, stress test, labs, endoscopy, and colonoscopy. *Id.* Objective findings included wheezing, abnormal pulmonary function testing, and abdominal tenderness. *Id.* Matthews identified GERD, anemia, and iron deficiency as secondary conditions contributing to Kennedy's disability. *Id.* Matthews stated Kennedy should not be exposed to chemicals, sprays, or smells that trigger her asthma. (AR 1070). Matthews stated Kennedy cannot be exposed to things that trigger her asthma. *Id.* Matthews stated, "With asthma attacks, she can't continue to work until her symptoms are resolved." *Id.* Matthews stated the prognosis for recovery was good, and Kennedy was not at maximum medical improvement. *Id.* Matthews expected fundamental changes in her medical condition within six months to a year. *Id.* Matthews noted:

> The patient needs to take medications as directed and follow up at pulmonology. She is on maximum medications and at work is exposed to her asthma triggers. If she can avoid these the asthma should improve. The patient is seeing pulmonology for medication management to help asthma be controlled. She is referred to hematology for possible IV iron to improve anemia.

*Id.* Matthews provided the opinion that Kennedy could sit two hours, stand one hour, and walk one hour in an eight hour workday. *Id.* Matthews indicated Kennedy had restrictions in lifting/carrying, squatting, crawling, and climbing, but did not elaborate. *Id.*

On September 1, 2010, Beth Beumer-Anderson, RN MSA ("Nurse Anderson"), a United nurse case manager, reviewed Kennedy's records and concluded that while the restrictions and limitations outlined in the APS completed by Matthews on July 29, 2010 were reasonable and consistent with the medical information presented, the restriction of working only five hours a day was not fully corroborated by the evidence presented. (AR 1303-08). However, Nurse Anderson noted, "based on the [claimant's] 6" walk test, this restriction is likely reasonable as well." (AR 1308). Nurse Anderson found it appeared in part that Plaintiff's specific work environment was exacerbating Plaintiff's asthma, and noted Kennedy "does have a respiratory pathology that is rendering her with certain impairments." (AR 1307). Nurse Anderson recommended United clarify whether Plaintiff would be able to return to work in her normal work capacity in a different work environment free of irritants. (AR 1308). On September 10, 2010, Claims Manager Doreen McNeil faxed Dr. Yergin a letter "seeking clarification on Ms. Kennedy's condition" and indicating she had "one additional question." (AR 359). The question posed was: "Would Ms. Kennedy be able to work in her sedentary occupation if she was not exposed to respiratory irritants?" *Id.* Dr. Yergin responded, "Yes" on September 20, 2010. *Id.*

On September 21, 2010, United denied Kennedy's claim for LTD benefits. (AR 885-93). United determined "a review of the medical records do not support restrictions and limitations that would prevent [Kennedy] from performing the duties of [her] regular

occupation." (AR 890). United explained the disability policy covered Kennedy's inability to perform the duties of her regular occupation and not from the specific job she was performing for her employer. (AR 890). United elaborated, "While you may have been experiencing work related issues, it does not mean that you are unable to perform the duties of your occupation for another employer." *Id.* United's records indicate this decision "was partly based on the [claimant's] doctor's (Dr. Bruce Yergin/Yergin Pulmonary Clinic) response to our 091010 letter, in which we asked about the [claimant's] ability to work at her sedentary occupation. Dr. Yergin affirmed that the [claimant] could work at her occ[upation] if she were not expose to respiratory irritants." (AR 1312).

Plaintiff appealed and submitted additional medical records from Dr. Ober's office. These records showed Kennedy returned to Dr. Ober's office on December 23, 2010 for exacerbation of asthma. (AR 76). She reported she had run out of medication and was not taking many chronic pulmonary medications. *Id.* Physical examination showed non-labored breathing, symmetric chest wall movement with no rales or rhonchi. (AR 77). There was expiratory wheezing in all lung fields. *Id.* Dr. Ober assessed acute bronchitis, asthmatic bronchitis and esophageal reflux, well controlled. (AR 78). Dr. Ober prescribed dexilant, Singulair, ranitidine, Advair Diskus, prednisone, and amoxicillin. *Id.*

Subsequent records from Dr. Ober's office indicate Kennedy was unable to obtain her asthma medications because she no longer had health insurance, and thus utilized the emergency room to receive medication. (AR 76-84). Kennedy was confined from December 30, 2010 through January 2, 2011 due to asthma exacerbation. (AR 79, 91-92). The diagnoses upon discharge were asthma exacerbation, improved; broncho-reactive

airway, likely secondary to a viral trigger; and possible community acquired pneumonia, not improved. (AR 91). On January 6, 2011, Kennedy presented to Matthews with asthma exacerbation with cough, shortness of breath, and wheezing. (AR 81). Kennedy indicated to Matthews that she lost her health insurance in July 2010 and had used up all of her medications. (AR 79). Because Kennedy indicated she was unable to buy her prescriptions, Matthews recommended Kennedy go to the emergency room for evaluation and treatment. (AR 81).

On January 12, 2011, Dr. Ober submitted a Pulmonary Medical Source Statement to United. (AR 767). Dr. Ober noted Kennedy had a total of six hospital emergency room visits in 2010 for respiratory symptoms. *Id.* Dr. Ober identified Kennedy's symptoms as shortness of breath, orthopnea, chest tightness, wheezing, episodic acute asthma, fatigue, and coughing. *Id.* Precipitating factors included upper respiratory infection, allergens, exercise, emotional upset/stress, irritants, and cold air/change in weather. *Id.* Dr. Ober stated Kennedy has asthma attacks three times a week and is incapacitated for several weeks during an average attack. *Id.* Dr. Ober stated emotional factors contribute to the severity of Kennedy's symptoms and functional limitations. *Id.* Dr. Ober stated Kennedy experienced weight gain as a side effect of her medications. (AR 768). His prognosis was fair and Kennedy's impairments can be expected to last at least a year. *Id.* Dr. Ober found Kennedy could: walk one city block without rest or severe pain; sit more than two hours at one time; stand more than two hours at one time; and sit and stand/walk at least six hours in an eight hour day. *Id.* Dr. Ober stated Kennedy would need to take unscheduled breaks four times a day to rest by lying down for one to two hours. *Id.* Dr.

Ober found Kennedy could rarely lift and carry less than ten pounds and never carry more. (AR 769). Kennedy could occasionally twist and rarely stoop, crouch/squat, climb ladders, or climb stairs. *Id.* Dr. Ober stated Kennedy should avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals. *Id.* Dr. Ober stated Kennedy would likely be "off task" (i.e. her symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks) twenty-five percent or more of the typical workday. *Id.* Dr. Ober stated Plaintiff was capable of a low stress job, but would likely be absent from work more than four days a month and her alleged impairments were consistent with her symptoms and functional limitations. (AR 770).

On February 14, 2011, Nancy Rosenstock, RN BSN ("Nurse Rosenstock"), a United nurse case manager, recommended Kennedy's file be sent for an external pulmonology peer review "[d]ue to the complexity of [her] diagnoses." (AR 1312). Nurse Rosenstock believed Kennedy's file "would benefit from a physician's interpretation of available pulmonary function tests and allergen testing; an assessment of any debilitating side-effects from prescribed medications; and identification of claimant's overall physical capabilities and any associated restrictions/limitations." *Id.*

On March 21, 2011, Dr. Benjamin Berg, a pulmonologist, reviewed Kenney's records, including the disability management documents, primary medical records, and physician disability statements. (AR 1356). Dr. Berg assessed "moderate persistent asthma." Dr. Berg found Kennedy's "lack of good asthma control is, in part, due to her

inconsistent use of the appropriately prescribed medical regime, for a variety of reasons."

(AR 1358). Dr. Berg noted Kennedy appeared to have "a problem with access to an adequate supply of prescribed effective medications for asthma, accounting for some of the poorly controlled symptoms. (AR 1360). Dr. Berg disagreed with some of Dr. Ober's opinions:

> Claims of significant impairment causing the claimant to require up to 4 unscheduled daily work breaks of up to 1-2 hours requiring the claimant to lie down is [sic] not supported by any of the data provided for this review. The restriction regarding carrying no more than 10 pounds is not consistent with any reported impairment.
>
> The information provided for this review documents that this claimant has moderately severe asthma, which is exacerbated by some odors and fumes, and is adequately controlled most of the time when she is on appropriately prescribed medications. The severity of her symptoms and frequency of exacerbation does not indicate that her medical condition is expected to cause symptoms or otherwise require breaks of 1-2 hours 4 times daily to lie down.

(AR 1359). Dr. Berg assessed limitations as follows:

> Restrictions would be no work in an environment which requires exposure to fumes, dust, gases, smoke, strong odors, chemical odors, extremes of temperature, or other triggers of asthmatic symptoms. Limitations would be no walking for more than 100 meters at her own pace without a 5 minute rest break between episodes with no more than 2 episodes of walking 100 meters per hour, no lifting or lifting and carrying more than 20 pounds, no climbing more than 15 stair steps without 5 minute rest break between episodes and no more than 2 stair climbing episodes per hour.

*Id.* Dr. Berg noted "[t]here are no specific identified unique environmental occupational triggers which require restriction from working in any specific identified location." *Id.* Dr. Berg stated he called Dr. Ober's office and attempted to consult with him "because I did not agree with his recommendations and restrictions and wished to speak with him to

determine if there was any additional data supporting his rationale." (AR 1361). Dr. Ober told Dr. Berg that Kennedy instructed him not to provide any information regarding her condition to Dr. Berg. (AR 1356).

On April 4, 2011, United upheld the denial of benefits. (AR 60). United acknowledged that Kennedy had a long history of asthma that appeared to be exacerbated by workplace exposure to smell, perfumes, cigarette smoke and chemicals. (AR 65). However, United found "the medical evidence does not support an impairment that would prevent her from performing her regular occupation of Therapist." *Id.* United explained, "To determine regular occupation, we look at the occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region." *Id.* United found the restrictions and limitations noted by Dr. Berg would not preclude working at a sedentary occupation, and Kennedy was not prevented from performing the occupational duties of a Therapist. *Id.* Having exhausted her administrative remedies, Kennedy initiated the instant lawsuit on July 6, 2011.

## II. STANDARD OF REVIEW

### A.    Summary Judgment Standard

Rule 56 provides that summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court must view all evidence and all

factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007).

"In an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. 2005) (per curiam) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)); *see Crume v. Met. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006). Accordingly, when reviewing a decision for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Crume*, 417 F. Supp. 2d at 1272 (*quoting Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)); accord *Young v. Bank of Am. Corp. Corporate Benefits Comm.,* No. 3:06-cv-89-J-33HTS, 2007 WL 294237, at *4 (M.D. Fla. Jan. 29, 2007)[3]; *Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).

---

[3] Unpublished opinions may be cited as persuasive on a particular point. The Court does not rely on unpublished opinions as precedent. Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 32.1, Fed. R. App. P. See also 11th Cir. R. 36-2.

## B.    ERISA Standard of Review

ERISA does not provide a standard to review decisions of a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B).[4] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *Paramore v. Delta Air Lines*, 129 F.3d 1446, 1449 (11th Cir. 1997).  In *Firestone*, the Supreme Court established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone*, 489 U.S. at 115.

In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the U.S. Supreme Court clarified that the burden of showing that the defendant's denial of benefits was both wrong and arbitrary and capricious remains on the plaintiff despite any conflict of interest on the defendant's part.  The *Glenn* Court instructed that the presence of a conflict of interest does not require "a change in the *standard* of review, say, from deferential to *de novo* review."  *Id.* at 115.  Instead, courts should consider a conflict of interest as a factor in determining whether the plan administrator abused its discretion.  *Id.* at 108.

In *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit recognized that *Glenn* implicitly overruled prior Eleventh Circuit precedent in which a conflict of interest triggered a heightened arbitrary and capricious standard.  The court stated: "We hold that the existence of a conflict of interest should merely be a factor for the

_____

[4]Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).

district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1360.

Nevertheless, after *Doyle*, the Eleventh Circuit has reiterated the six-step analysis previously set forth in *Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004). *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010). In short, the steps require the Court to address the following issues:

1. Was the administrator's decision wrong, i.e., does the Court disagree with the decision under a <u>de novo</u> standard of review?

2. If the Court disagrees with the administrator's decision, was the administrator vested with discretion under the ERISA Plan in reviewing claims?

3. If the administrator had discretion, was its decision arbitrary and capricious, *i.e.,* lacking any reasonable grounds?

4. If there were reasonable grounds for the decision, was the administrator acting under a conflict of interest?

5. Assuming no conflict of interest, the decision should be affirmed.

6. If there was a conflict of interest, review the decision under the heightened arbitrary and capricious standard.

*Capone*, 592 F.3d at 1195. The *Capone* court held that *Glenn* and *Doyle* left the *Williams* "methodology" intact except for the sixth step. *Id.* at 1196. Therefore, this Court will follow that analysis for United's challenged decision.

## III. ANALYSIS

The Court must start its inquiry by determining whether United's decision to deny benefit, when reviewed *de novo*, was "wrong." The Court must "decide whether it agrees with the administrator's decision." *Creel v. Wachovia Corp.*, No. 08-10961, 2009 WL 179584, at *6 (11th Cir. Jan. 27, 2009). In determining whether United's decision was "wrong," the Court does not give any deference to United's decision. *Williams*, 373 F.3d at 1137. If the Court does not agree with United's decision to deny the claim (and United is vested with discretion in reviewing such claims), the Court must then determine whether "reasonable" grounds nevertheless supported the decision.[5] *Creel*, 2009 WL 179584, at *6. As United concedes, the Court must consider its conflict of interest as a factor in determining whether its decision was arbitrary and capricious.

In the instant case, the parties have intertwined their arguments as to whether United's decision was wrong and unreasonable. Some courts have begun their analysis by assuming the plan administrator's decision was wrong and proceeded directly to the question of whether the administrator's decision was arbitrary and capricious. *See Pinto v. Aetna Life Ins. Co.,* No. 6:09-cv-1893-Orl-22GJK, 2011 WL 536443, at *9 (M.D. Fla. Feb. 15, 2011); *Barchus v. Hartford Life & Accident Ins. Co.*, 320 F.Supp.2d 1266, 1285 (M.D. Fla. 2004). In this report and recommendation, the undersigned will analyze the facts and the parties' arguments once in arriving at its conclusions that United's decision was neither wrong nor arbitrary and capricious. *See Moeller v. Guardian Life Ins. Co.*, No. 5:10-cv-457-Oc-34TBS, 2011 WL 7981954 (M.D. Fla. Dec. 16, 2011) (combining its

---

[5] The parties do not dispute that United had discretionary authority under the Policy and the arbitrary and capricious standard is invoked.

analysis as to whether administrator's decision was wrong and unreasonable).  For the reasons discussed below, the undersigned finds United's decision was not wrong because the record evidence does not support an impairment that would prevent Kennedy from performing her regular occupation as it is normally performed in the national economy. Even if United's decision was wrong, the undersigned finds it was not arbitrary and capricious, because the statement of Kennedy's treating pulmonologist and the peer review conducted by Dr. Berg, a board certified internist with a specialty in pulmonology, provided United with a reasonable basis for its conclusion that Kennedy was not totally disabled.

Upon review of the entire record, the undersigned agrees with United's conclusion that the medical evidence does not support an impairment that would prevent Kennedy from performing her regular occupation of therapist as it is normally performed in the national economy.  Clearly, Kennedy suffers from asthma and has a history of exacerbation of her symptoms from exposure to certain fumes and smells, particularly cigarette smoke, mold, and cleaning products.  The record before United at the time of its decision, however, fails to demonstrate that Kennedy's asthma prevents her from performing the essential functions of her position as it is normally performed, not just as it is performed at her particular workplace.  Kennedy's own treating pulmonologist expressed the opinion that she could work in her sedentary occupation if she was not exposed to respiratory irritants.  (AR 359).  Dr. Berg, a board certified internist and pulmonologist, also determined Kennedy was capable of sedentary work in an environment free of respiratory triggers such as fumes, dust, gases, smoke, strong odors,

chemical odors, and extreme temperatures. (AR 1359). Dr. Berg found Kennedy's asthma treatment was appropriate and largely effective, and her asthma was largely controlled when she was taking her prescribed medications. (AR 1359). Dr. Berg noted Kennedy's episodes of exacerbation were associated with her failure to strictly comply with her medication regime. (AR 1359). Dr. Berg's assessment is supported by Matthews' and Dr. Ober's clinical notes, which showed Kennedy was not always compliant with her treatment plan and lacked access to medications. The July 2010 APS completed by Matthews did not contain many limitations beyond avoiding exposure to asthma triggers. (AR 1070). Matthews also indicated that Kennedy needed to take medications as directed, and expressed optimism regarding her prognosis. (AR 1070). In contrast, the more restrictive limitations contained in the January 2011 Pulmonary Medical Source Statement appear to correlate with Kennedy's declining condition, which was largely due to her inability to obtain her medications. (*See* AR 76-84).

Kennedy argues United denied her claim for long term disability based solely on the opinion of Dr. Yergin and improperly disregarded the opinion of her treating physician, Dr. Ober. (Doc. #19 at 8-9). Kennedy argues United arbitrarily gave no weight to the opinions of her treating physician, Dr. Ober, even though there is no reliable evidence to contradict his opinions. Further, Kennedy argues the "peer review" conducted by Dr. Berg is suspect and is not based upon any examination or other direct contact with Kennedy.

The Court disagrees with Kennedy's assertion that United based its decision "solely" on the basis of Dr. Yergin's opinion that Kennedy would be able to work in her sedentary occupation if she was not exposed to respiratory irritations. In its final denial letter, United

cited to the myriad of records it reviewed as part of its evaluation of Kennedy's claim. (AR 61). That Kennedy's medical records were thoroughly reviewed by Nurse Anderson is shown by her detailed note entries summarizing various records. (AR 1305-07). Further, United's system notes indicate the decision to deny benefits "was *partly* based" on Dr. Yergin's response. (AR 1312) (emphasis added). It was not improper for United to credit Kennedy's treating pulmonologist's opinion that she could work in her sedentary occupation if she was not exposed to respiratory irritants.

Kennedy argues Dr. Yergin's opinion should be afforded no weight because it is conclusory and factually deficient, as he was not provided with a description of her particular job and work environment. However, Dr. Yergin did not need a description of Kennedy's work environment to render a thoughtful opinion as to whether she would be able to perform her sedentary occupation in an environment that was free of respiratory irritants. As United repeatedly emphasized in its letters to Kennedy, its decision would be based on whether she was unable to perform the duties of her occupation "as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer." (AR 61). Kennedy has demonstrated that she has a diagnosis of asthma which is exacerbated by exposure to particular irritants, such as cigarette smoke, mold, and cleaning products, at her workplace. However, Kennedy has not demonstrated that she is unable to perform her duties as a therapist in a work environment other than River Point. This is precisely what United sought to determine when it contacted Dr. Yergin for his opinion. That United relied upon his unequivocal response was not improper.

Further, contrary to Kennedy's assertion, United did not "arbitrarily refuse to credit

[her] reliable evidence," i.e. Dr. Ober's opinions. Rather, United found that the limitations and restrictions assessed by Dr. Ober in the January 2011 Pulmonary Medical Source Statement were not supported by the record evidence, as determined by its own review of the medical evidence and as corroborated by Dr. Berg. Dr. Berg clearly did not take his decision to contradict Dr. Ober's opinion lightly. Prior to rendering his report, Dr. Berg attempted to contact Dr. Ober precisely because he did not agree with Dr. Berg's recommendations and wished to determine if there was any additional data supporting his rationale. (AR 1361). Unfortunately, Dr. Ober would not discuss Kennedy's condition with Dr. Berg because she had instructed him not to do so. *Id.* Dr. Berg's efforts to engage in an open dialogue with Dr. Ober undermine Kennedy's assertion that his peer review is "suspect" due to his relationship with United.

Moreover, United's reliance on Dr. Berg's opinions over those of Dr. Ober was neither wrong nor arbitrary. Although a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," an administrator is not required to give special deference to the opinions of a claimant's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Courts may also not impose a burden of explanation on an administrator when the administrator credits reliable evidence that conflicts with a treating physician's evaluation. *Id.* "It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Hufford v. Harris Corp.*, 322 F.Supp.2d 1345, 1359 (M.D. Fla. 2004); *see also Cook v. Standard Ins. Co.,*

No. 6:08-cv-759-Orl-35DAB, 2010 WL 807443, at *13 (M.D. Fla. Mar. 4, 2010) ("[A]n ERISA administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant, but instead views the claimant's medical record."); *Bates v. Metro. Life. Ins. Co.,* No. 5:08-cv-22(CAR), 2009 WL 2355834, at *16 (M.D. Ga. July 27, 2009) ("MetLife was not wrong to rely on [the peer review] physicians' opinions and afford less weight to the unsupported conclusions of Plaintiff's treating physicians. The law is clear that an administrator is not required to give greater deference to the opinions of a claimant's treating physicians than to their own hired consultants."). Thus, the fact that United credited Dr. Berg's opinion does not suggest that its decision was made without reflection or was the product of arbitrariness.[6]

United argues Kennedy did not receive medical care from July 27, 2010 through December 25, 2010, and thus failed to provide evidence of disability during that time and failed to receive "Regular Care" or "Appropriate Care and Treatment" as required by the

_____

[6] The case cited by Kennedy in support of her argument that United's reliance on Dr. Berg was improper is distinguishable on its facts. In *Menard v. Hartford Life & Accident Ins. Co.*, the district court found Hartford's decision was wrong because it was based solely on the reports of two physicians it hired, who rejected the claimant's reports regarding the symptomatology he was experiencing "for some unknown reason" and "essentially determined that [the claimant] was lying about his pain." No. 6:05-cv-1145-Orl-31DAB, 2008 WL 506228, at *2 (M.D. Fla. Feb. 14, 2008). The court found the only objective information available confirmed the claimant's injury, and there was no reason to disbelieve his claims of pain. *Id.* Here, United's reviewing pulmonologist, Dr. Berg, did not reject Kennedy's symptomatology and her reports of asthma exacerbation. Rather, he differed with Dr. Ober as to the extent those symptoms limited Kennedy's ability to perform work functions. Indeed, Dr. Berg agreed that the information in the record "documents that this claimant has moderately severe asthma, which is exacerbated by some odors and fumes, and is adequately controlled most of the time when she is on appropriately prescribed medications." (AR 1359). However, Dr. Berg disagreed with Dr. Ober's opinion that her asthma "would require breaks of 1-2 hours 4 times daily to lie down," because this limitation was "not supported by any of the data provided for this review." *Id.*

Policy.  (Doc. #18 at 12).   The Court agrees that this gap in treatment undermines Kennedy's position that her asthma condition was disabling and also fails to comply with the terms of the Policy.   From her alleged onset date of January 5, 2010 through July 2010, Kennedy was seen at Dr. Ober's office almost once a week for several months due to asthma exacerbation.  Dr. Ober's July 27, 2010 record indicates he instructed Kennedy to follow up with pulmonology and continue her medications.   (AR 536).   However, Kennedy failed to attend her August 2, 2010 appointment with Dr. Yergin and apparently never rescheduled, despite the fact that she was to undergo "a workup for exacerbation of bronchial asthma."  (AR 348, 369).   Kennedy then inexplicably did not seek medical treatment for her asthma, or any other condition, for almost five months.   The Eleventh Circuit has upheld the denial of benefits where a claimant fails to comply with a "regular care of a physician" clause.   *See Muzyka v. UNUM,* 195 Fed. Appx. 904, 909-10 (11th Cir. 2006) (upholding a denial of benefits based on the claimant's failure to comply with the regular care requirement, where the record showed that the claimant, who alleged that she was suffering from fibromyalgia and chronic pain, visited the doctor only seven times in an eighteen month period); *see also Walker-Hall v. American Intern. Life Assur. Co. of New York*, 788 F.Supp.2d 1355, 1359-62 (M.D. Fla. 2011) (upholding denial of benefits where claimant failed to visit orthopedist for over a year for her allegedly disabling knee injury); *Mack v. UNUM,* 471 F.Supp.2d 1285, 1289-91 (S.D. Fla. 2007) (upholding denial of benefits based on claimant's failure to comply with regular care provision, where record showed claimant, who was suffering from diabetes, did not seek treatment for this condition during three separate periods, each ranging from four months to six months).

The Court has determined, based upon its *de novo* review, that United's decision was not wrong. Nonetheless, for the sake of thoroughness in its report and recommendation, the Court felt it prudent to also discuss whether United's decision was arbitrary and capricious. If the Court had found United's decision to be wrong, it would have to consider United's admitted conflict of interest as a factor in its analysis of whether United's decision was reasonable. *Doyle*, 542 F.3d at 1360. Kennedy bears the burden of showing United's decision was arbitrary; it is not United's burden to prove its decision was not tainted by self-interest. *Id.* In this case, there is nothing in the totality of circumstances that indicates United's conflict of interest was a factor in its decision. There is no evidence of inappropriate claim handling or a pattern of biased decisions by United. As discussed above, United investigated the case thoroughly, developed a complete record, and its decision is well supported by the administrative record. United took numerous measures to ensure objectivity by obtaining clarification from Kennedy's treating pulmonologist and seeking independent review of Kennedy's medical records in recognition of "the complexity of claimant's diagnoses." (AR 1312). For these reasons, the Court finds United was not influenced by its conflict of interest in deciding Kennedy's claim.

The evidence in the administrative record, including the results of an independent peer review, establishes that Kennedy was not disabled under the terms of the Policy. The undersigned finds that United had a reasonable basis for its conclusion that Kennedy was not totally disabled. Accordingly, United's decision to deny benefits was neither wrong, nor arbitrary and capricious.

### IV. Conclusion

After considering the record as a whole, the undersigned cannot find, even accounting for United's conflict, that United's decision to deny long-term disability benefits was wrong or arbitrary and capricious. Thus, it is respectfully **RECOMMENDED** that

1.  Defendant's Motion for Summary Judgment (Doc. #18) be **GRANTED**; and

2.  Plaintiff's Motion for Summary Judgment (Doc.# 19) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida this 6th day of July, 2012.

THOMAS E. MORRIS
United States Magistrate Judge

Copies to: Hon. Roy B. Dalton
All counsel of record